**WARNING: AT LEAST ONE DOCUMENT COULD NOT BE INCLUDED!**
**You were not billed for these documents.**
**Please see below.**

| Document Number | Document Description | Pages | Document Error |
|---|---|---|---|
| Document 38 attachment | Attachment | 1 | **DOCUMENT COULD NOT BE RETRIEVED!** **However, it may still be viewable individually.** |

**IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| THE PROTECT DEMOCRACY PROJECT, INC. | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civil Action No. 1:17-cv-00842-CRC |
| U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF JUSTICE, and U.S. DEPARTMENT OF STATE, | ) ) ) ) | |
| *Defendants*. | ) ) ) ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF
(ECF NO. 37)**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………………………………………………………………….... i

INTRODUCTION ……………………………………………………………….…………. 1

ARGUMENT ……………………………………………………………………………… 3

    I.    The Court should grant summary judgment for Protect Democracy and order disclosure of the 2017 memo because the government waived Exemption 5 by publicly disclosing the 2018 memo. ……………………………………………...………………….. 3

        A.  The Court correctly identified the official-acknowledgment test as the appropriate legal framework for evaluating the government's waiver. …………………..…… 3

        B.  Protect Democracy has carried its burden of production under the official-acknowledgment test. ………………………………………………….……..... 5

              i.   The memos apparently contain matching discussions of the three national interests supporting missile strikes on Syria without congressional authorization. ……………………………………………….……..... 7

             ii.  The memos apparently contain matching specificity in identifying legal precedents. ……………………………………………….……... 11

            iii.  The memos apparently contain matching discussions of whether the missile strikes on Syria rose to the level of a "war." ……………………..……… 11

            iv.  The superficial differences highlighted by the government are immaterial. ……………………………………………………………………... 12

        C.  The government hasn't rebutted Protect Democracy's prima facie showing. …... 14

    II.   In the alternative, the Court should review the 2017 memo in camera to determine whether releasing the 2018 memo waived Exemption 5. …………………….…... 15

CONCLUSION…………………………………………………………………………… 17

# **TABLE OF AUTHORITIES**

## **Cases**

*ACLU v. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011) ........................................................3

*ACLU v. U.S. Dep't of Justice*, No. 15-cv-1954, 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016) ....................................................................................................................................15

*Allen v. CIA,* 636 F.2d 1287, 1298 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology of Wash., D.C., Inc. v. Smith,* 721 F.2d 828, 830 (D.C. Cir. 1983) ......15

*Bayala v. U.S. Dep't of Homeland Sec.*, 264 F. Supp. 3d 165, 174-77 (D.D.C. 2017) ...............13

*Callaway v. U.S. Dep't of Treasury,* No. 08-5480, 2009 WL 10184495, at *2 (D.C. Cir. June 2, 2009)...............................................................................................................................5

*Canning v. U.S. Dep't of Justice*, 263 F. Supp. 3d 303, 311 (D.D.C. 2017)..................................4

*\*Carter v. U.S. Dep't of Commerce,* 830 F.2d 388, 393 (D.C. Cir. 1987) ...................................15

*\*Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999) ......................................................4, 5, 15

*\*Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992)...............................3, 4, 5

*Envtl. Integrity Project v. Small Bus. Admin.*, 151 F. Supp. 3d 49, 53 (D.D.C. 2015)................15

*In re Sealed Case,* 121 F.3d 729, 741 (D.C. Cir. 1997)...............................................................3

*Judicial Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 13 (D.D.C. 2013).........................4

*Kerr v. U.S. District Court for N.D. Cal.*, 426 U.S. 394, 405-06 (1976)....................................15

*Lieff, Cabraser, Heimann & Bernstein, LLP v. U.S. Dep't of Justice*, 697 F. Supp. 2d 79, 85-86 (D.D.C. 2010)...............................................................................................................4

*\*N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir. 2014)......................4, 6, 16

*North v. U.S. Dep't. of Justice*, 810 F. Supp. 2d 205, 208 (D.D.C. 2011)....................................4

*Pike v. U.S. Dep't of Justice*, ___ F. Supp. 3d ___, 2016 WL 5108012, at *6 (D.D.C. 2016).......5

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.,* 263 F. Supp. 3d 293, 300 (D.D.C. 2017) ....................................................................................................................................17

*Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ............................................................17

**Other Authorities**

*Authority to Use Military Force in Libya*, 35 Op. OLC ___ (Apr. 1, 2011),
https://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in-
libya_0.pdf ....................................................................................................................11

Steven A. Engel, Ass't Att'y Gen., OLC, *April 2018 Airstrikes Against Syrian Chemical-Weapons
Facilities* (May 31, 2018), http://www.justice.gov/olc/opinion/file/1067551/...........................1

# INTRODUCTION[1]

This Court has correctly discerned that OLC's release of its 2018 memo on this year's Syria missile strikes shifted the landscape of this litigation. The release of the justification for the 2018 strikes calls into question the government's ability to rely on FOIA Exemption 5 to withhold the 2017 memo justifying last year's strikes. As this Court's Order observed, the information in the 2018 memo appears to duplicate—in multiple respects—the information in the 2017 memo:

- Although the 2018 memo contains "some factual background specific to the April 2018 strike[,] . . . little of its legal reasoning—which consumes the bulk of its 22 pages—is particularized to the recent strike." Order at 3.

- Pages nine through eighteen "explain the national interests supporting the 2018 strikes, but . . . those interests seem readily applicable to the 2017 strike." *Id.*

- "The final five pages—which evaluate whether the 2018 strike rose to the level of a 'war'—are more particularized, but similarly contain portions with possible relevance to the 2017 strike." *Id.*

- "[S]ome of the reasoning articulated in the 2018 memorandum also closely aligns

---

[1] Throughout this brief, "**Protect Democracy**" refers to plaintiff The Protect Democracy Project, Inc.; "**the government**" refers collectively to defendants the United States Departments of Defense, Justice, and State; "**Order**" refers to the Court's *sua sponte* June 5, 2018 Order, ECF No. 36; "**OLC**" refers to the Department of Justice's Office of Legal Counsel; "**2018 memo**" refers to Steven A. Engel, Ass't Att'y Gen., OLC, *April 2018 Airstrikes Against Syrian Chemical-Weapons Facilities* (May 31, 2018), http://www.justice.gov/olc/opinion/file/1067551/download; "**2017 memo**" refers to *Vaughn* Index, Docs. 1-3, ECF No. 24-7; "**Pl. Cross-Mem.**" refers to Pl. Mem. of Law in Supp. of Pl. Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J., ECF No. 26-2; "**Pl. Rep. Mem.**" refers to Pl. Reply Mem. in Supp. of the Cross-Mot. for Summ. J., ECF No. 30; and "**Gov. Supp.**" refers to Defs.' Suppl. Br. in Resp. to the Ct.'s Order of June 5, 2018, ECF No. 37.

In addition, throughout this brief, emphases in quotations were added unless otherwise stated; and quotation marks, alterations, footnote references, and citations were omitted from quotations.

with the publicly stated rationale for the 2017 strike. Indeed, the 2018 memorandum explicitly draws on the administration's public-facing legal justifications for the 2017 strike." *Id*.

Two questions are now presented:

1.     Did the Court's Order correctly identify the D.C. Circuit's "official-acknowledgment test" as the appropriate legal framework for evaluating the government's waiver?

2.     Given the apparent duplication of information in the two memos (as discussed in the Order), should the Court grant summary judgment for Protect Democracy, or at least exercise its undisputed[2] discretion to view the 2017 memo *in camera* to determine whether releasing the 2018 memo waived FOIA Exemption 5 with respect to the 2017 memo?

The answer to both questions is "yes." Cases from this Circuit establish that the official-acknowledgment test for waiver of a FOIA exemption is ***not*** limited to classified materials, as the government erroneously contends. And Protect Democracy has carried its initial burden under Circuit law of showing that the requested information in the 2017 memo appears to have (1) equal specificity to and (2) content that matches (3) the information in an official and documented disclosure (the 2018 memo). The government cannot rebut that showing, as it cannot demonstrate that the information in the 2018 memo—which was posted on the internet for the whole world to see—has been removed from the public domain.

---

[2] *See* Gov. Supp., at 13 ("[A] court has broad discretion to determine the need for *in camera* review.") (parenthetically quoting *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 20 (D.C. Cir. 1984)).

The Court therefore should grant Protect Democracy's summary judgment motion, or at least exercise its undisputed discretion to view the 2017 memo *in camera* to help determine the waiver issue.

## ARGUMENT

I. **The Court should grant summary judgment for Protect Democracy and order disclosure of the 2017 memo because the government waived Exemption 5 by publicly disclosing the 2018 memo.**

    A. **The Court correctly identified the official-acknowledgment test as the appropriate legal framework for evaluating the government's waiver.**

The Court's Order correctly concludes that the D.C. Circuit's official-acknowledgment test governs here. Under that test, "a showing of public availability renders the FOIA exemptions inapplicable." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992). "If the government has officially acknowledged information, a FOIA plaintiff may compel disclosure of that information even over an agency's otherwise valid exemption claim." *ACLU v. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011). "For information to qualify as 'officially acknowledged,' it must satisfy three criteria: (1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *Id.* at 620-21 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).[3] Likewise, the presidential communications privilege,[4] as well as "the attorney-client and deliberative privileges, in the context of Exemption 5, may be lost by

---

[3] The Court applied this test in its last two orders. *See* Order at 2; Order dated Apr. 25, 2018, at 3, ECF No. 33.

[4] *See In re Sealed Case,* 121 F.3d 729, 741 (D.C. Cir. 1997) ("[C]ourts have said that release of a document only waives these privileges for the document *or information* specifically released.").

disclosure." *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir. 2014).

While the D.C. Circuit test requires a "specific" "match" to establish waiver of a FOIA exemption, the test is not an "inflexible rule requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material." *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999). "There may not be much flexibility in the public domain doctrine—but there is some . . . ." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 13 (D.D.C. 2013). There is room, in other words, for reasonable inferences to be drawn concerning the similarities between the released and unreleased information. Litigating the official-acknowledgment test therefore proceeds in two steps:

1.    The plaintiff carries its initial burden of production[5] by "point[ing] to *specific* information in the public domain that *appears to duplicate* that being withheld." *Cottone*, 193 F.3d at 554. The plaintiff's showing on the "appearance of duplication" issue may include, for example, official government letters revealing information that *must* be in the withheld materials, *see, e.g.*, *Canning v. U.S. Dep't of Justice*, 263 F. Supp. 3d 303, 311 (D.D.C. 2017); *id.* at 314, as well as "any specific explanation of the overlap between the information" in the officially documented disclosures and the documents sought. *Lieff, Cabraser, Heimann & Bernstein, LLP v. U.S. Dep't of Justice*, 697 F. Supp. 2d 79, 85-86 (D.D.C. 2010).[6]

---

[5] "The ultimate burden of persuasion, to be sure, remains with the government, but a party who asserts that material is publicly available carries the burden of *production* on that issue." *Davis*, 968 F.2d at 1279 (emphasis in original).

[6] The government's assertion that Protect Democracy's showing regarding the 2018 memo is mere "speculation" fails in light of the "appears to duplicate" standard and *Cottone*'s teaching that no "hard copy simulacrum of the sought-after material" is required in order to prove waiver under the official-acknowledgment test. *Cottone*, 193 F.3d at 555-56; *see, e.g.*, *North v. U.S. Dep't. of Justice*, 810 F. Supp. 2d 205, 208 (D.D.C. 2011) ("While the excerpts of trial testimony produced by North do not establish that the documents themselves became part of the public record, they are sufficient to demonstrate that some information within the requested documents may have been publicly disclosed."); *Callaway v. U.S. Dep't of Treasury,* No. 08-5480, 2009

2.      "Once the FOIA requester has carried [its] burden of production, it is up to the

government, if it so chooses, to rebut the plaintiff's proof by demonstrating that the specific . . .

records identified [as having been disclosed] have since been destroyed, placed under seal,[7] or

otherwise removed from the public domain." *Cottone*, 193 F.3d at 556.

The government erroneously asserts that the official-acknowledgment test applies only to

classified materials within the ambit of Exemption 1. Gov. Supp., at 4-5. That assertion ignores

several contrary cases from this Circuit applying the test to *unclassified* audiotape recordings

made during criminal investigations, some or all of which had been introduced during court

proceedings, and which the government claimed were subject to Exemptions 3 and/or 7. *See

Davis*, 968 F.2d at 1279; *Cottone*, 193 F.3d at 555; *Pike v. U.S. Dep't of Justice*, ___ F. Supp. 3d

___, 2016 WL 5108012, at *6 (D.D.C. 2016).

The official-acknowledgment test therefore applies here as well. And under that test, as

discussed below, releasing the 2018 memo waived the government's claim to Exemption 5

protection for the 2017 memo.

### B. Protect Democracy has carried its burden of production under the official-acknowledgment test.

Protect Democracy has carried its burden of production under the official-

acknowledgment test.

As a threshold matter, we may immediately dispose of the test's third criterion. Because

---

WL 10184495, at *2 (D.C. Cir. June 2, 2009) (remanding case after plaintiff satisfied initial
burden by showing public transcripts of criminal trial and sentencing hearing, and requiring
comparison of the trial transcripts "to the grand jury transcripts to determine whether any portion
of the grand jury transcripts is identical to the public transcripts.").

[7] The phrase "placed under seal" relates to *Cottone*'s facts (involving evidence presented at a
trial) and does not apply here.

OLC released the 2018 memo as a formal opinion, it is plainly an "official and documented" disclosure. The government does not dispute that Protect Democracy has satisfied that criterion.[8]

Thus, the remaining questions are **(1)** whether Protect Democracy can carry its burden of showing that the requested information in the 2017 memo appears to be as specific as, and to substantively match, the information previously released in the 2018 memo; and **(2)** if so, whether the government has rebutted that showing by, for example, proving that the 2018 memo has since been destroyed or otherwise removed from the public domain.

As to question **(1)**, Protect Democracy has met its burden of production. As the Court's Order observes, the 2018 memo appears to duplicate the 2017 memo in specificity and subject matter. Order at 3. Overall, "little of [the 2018 memo's] legal reasoning . . . is particularized to the recent strike." *Id.*  More specifically, **(i)** pages nine through eighteen "explain the **national interests supporting the . . . strike[]**" in terms that seem "readily applicable to the 2017 strike"; **(ii)** the legal reasoning is just as specific, even down to the precedents cited; and **(iii)** "[t]he final five pages—which evaluate **whether the . . . strike rose to the level of a 'war,'** . . . contain portions with possible relevance to the 2017 strike." *Id.*

Each of the Court's observations was correct and supported by undisputed evidence, as demonstrated below; and together, they more than carry Protect Democracy's burden of production.

---

[8] Moreover, the Court has authority to consider the government's official and documented disclosure after a FOIA has been filed, as even the government's cited case contemplates. Gov. Supp., at 3 n.2 (*citing Bonner v. U.S. Dep't of State,* 928 F.2d 1148, 1153 n.10 (D.C. Cir. 1991)) ("In certain limited situations, such as the publication of a document after an agency has decided to withhold, it may be appropriate for a court to review the agency decision in light of post-decision changes in circumstances."); *see also N.Y. Times Co.*, 756 F.3d at 121 (granting *in camera* review for OLC memoranda to determine whether privilege had been waived after the subsequent release of a DOJ white paper and numerous public statements.).

  i. **The memos apparently contain matching discussions of the three national interests supporting missile strikes on Syria without congressional authorization.**

The 2018 memo asserts that the reasons for the strike are "consistent with those that the President and his advisers have relied upon in the past." 2018 memo, at 11. Indeed, they are, for the government, in its 2018 memo, explains that the 2017 Syria strikes relied on the same legal basis as the 2018 strikes and explicitly cites the President's 2017 Congressional Notification statement as setting forth an accurate recounting of the legal basis for the 2017 strikes. As OLC explained:

> In carrying out these strikes, the President also relied on the national interest in deterring the use and proliferation of chemical weapons. The President previously relied upon this interest in ordering the April 2017 airstrike in response to the attack on Khan Shaykhun. *See* 2017 Congressional Notification (stating that the President directed a strike on the Shayrat military airfield to "degrade the Syrian military's ability to conduct further chemical weapons attacks and to dissuade the Syrian regime from using or proliferating chemical weapons, thereby promoting the stability of the region and averting a worsening of the region's current humanitarian catastrophe.")

2018 memo, at 16. And the government has been entirely consistent on that point: the 2018 memo's statements regarding the legal basis for the 2017 strikes follow prior statements made by Cabinet officials and other high-ranking Administration officials. *See, e.g.*, Pl. Rep. Mem., at 18-20 (cataloging prior statements by government officials); Pl. Cross-Mem. Exs. B through I, ECF Nos. 26-4 through 26-11. So now that the 2018 memo has further buttressed Protect Democracy's evidentiary showing by vouching for the accuracy of the Congressional Notification—which overlaps with the stated justificatory interests in the prior statements made by Administration officials—the government cannot argue that Protect Democracy is engaging in guesswork or speculation[9] regarding the contents of the 2017 memo. Protect Democracy is

---

[9] *See* Gov. Supp., at 8-9.

doing nothing more than simply repeating what the government has told the public in vetted statements on a consistent basis for over a year.

The government's asserted national interests in its legal rationale for the Syria strikes are **(1)** "the promotion of regional stability," **(2)** "the prevention of a worsening of the region's humanitarian catastrophe," and **(3)** "the deterrence of the use and proliferation of chemical weapons." *Id.* at 11. Even the way the 2018 memo phrases these interests echoes the phrasing of other statements issued in 2017.[10] Below, we examine the similarities with respect to each of the three asserted national interests.

**Promoting regional stability.** Just as in 2017, the 2018 memo identifies the promotion of regional stability as a justificatory national interest: "Here, the President could reasonably determine that Syria's use of chemical weapons in the ongoing civil war threatens to undermine further peace and stability of the Near East . . . ."[11] That is a reboot of a 2017 rationale, as the 2018 memo cites Ambassador Nikki Haley's statement on the need for "a stable region" in March 2017.[12] Likewise, "promoting regional stability" was one of the three national interests cited in the 2017 Congressional Notification.[13] And the NSC Spokesperson likewise repeated in

---

[10] *See, e.g.* the 2017 "Basis for Using Force" talking points, Pl. Cross-Mem. Ex. I, at 3, ECF No. 26-11 ("The United States has a strong national interest in preserving regional stability, averting a worsening of the humanitarian catastrophe in Syria, and deterring the use and proliferation of chemical weapons . . . ."); NSC spokesperson's statement, Pl. Cross-Mem. Ex. H, at 3, ECF No. 26-10 ("The United States has a strong national interest in preserving regional stability, averting a worsening of the humanitarian catastrophe in Syria, and deterring the use and proliferation of chemical weapons . . . .").

[11] 2018 memo, at 11-12.

[12] *Id.* at 13 ("[I]f we don't have a stable Syria, we don't have a stable region.").

[13] Pl. Cross-Mem. Ex. B, at 3, ECF No. 26-4.

2017 that the United States has a "strong national interest in preserving regional stability . . . ."[14]
The 2017 Basis for Using Force talking points also cited the "strong national interest in
preserving regional stability . . . ."[15]

     **Preventing worsening of humanitarian catastrophe.** Just as in 2017, the 2018 memo
identifies "prevention of a worsening of the region's humanitarian catastrophe"[16] as a
justificatory national interest. In 2017, the Basis for Using Force talking points and NSC
spokesperson likewise cited the "strong national interest in . . . averting a worsening of the
humanitarian catastrophe in Syria . . . ."[17] On the day of the 2017 strikes, then-National Security
Advisor McMaster also spoke of the humanitarian interest: "[D]uring the President's
deliberations . . . we weighed . . . the risk associated with any military action . . . against the risk
of inaction, which Secretary Tillerson has already really summarized, which is the risk of this
continued egregious, inhumane attacks on innocent civilians with chemical weapons."[18]

     **Deterring chemical weapon use and proliferation.** Just as in 2017, the 2018 memo
cites "deterring the use and proliferation of chemical weapons" as a justificatory national
interest, even noting that "[t]he President previously relied upon this interest in ordering the
April 2017 airstrike . . . . *See* 2017 Congressional Notification . . . ."[19] As then-White House

---

[14] Pl. Cross-Mem. Ex. H, at 3.

[15]  Pl. Cross-Mem. Ex. I, at 3.

[16] *Compare* 2018 memo, at 11 *with 2*017 Congressional Notification, at 3 ("avert[ ] a worsening
of the region's current humanitarian catastrophe."); *see also* Pl. Cross-Mem. Ex. C, at 5, ECF
No. 26-5 (asserting "humanitarian relief").

[17] Pl. Cross-Mem. Ex. I, at 3; Pl. Cross-Mem. Ex. H, at 3.

[18] Pl. Cross-Mem. Ex. D, at 4, ECF No. 26-6.

[19] 2018 memo, at 16.

Spokesman Sean Spicer reiterated days after the 2017 strikes: "[T]he reason that we took action was multifold—number one, to stop the proliferation and deterrence [sic] of chemical weapons."[20] The 2017 Basis for Using Force talking points echoed that rationale: "The targeted U.S. military action . . . was justified and legitimate as a measure to deter and prevent Syria's illegal and unacceptable use of chemical weapons . . . . The U.S. use of force is necessary and proportionate to the aim of deterring and preventing the future use of chemical weapons by the Syrian government."[21] Administration officials, including Defense Secretary Mattis and U.N. Ambassador Haley, likewise cited the deterrence of chemical weapons.[22]

Even the specific way the government developed this rationale was the same in 2018 as in 2017. The 2018 memo explains that the U.S. should deter the use and proliferation of chemical weapons because "Syria's possession and use of chemical weapons have increased the risk that others will gain access to them."[23] Likewise, in 2017, then-Secretary of State Tillerson provided the same rationale, explaining that "one of the existential threats we see on the ground in Syria is if there are weapons of this nature available in Syria," the weapons could "fall into the hands of those who would bring those weapons to our shores to harm American citizens."[24] The 2017 Basis for Using Force reiterated the national interest in "deterring the use and proliferation of chemical weapons, especially in a region rife with international terrorist groups with long-

---

[20] Pl. Cross-Mem. Ex C, at 5.

[21] Pl. Cross-Mem. Ex. I, at 3.

[22] Pl. Cross-Mem. Ex. F, at 2, ECF No. 26-8; Pl. Cross-Mem. Ex. G, ECF No. 26-9.

[23] 2018 memo, at 12-13.

[24] Pl. Cross-Mem. Ex. D, at 3; *see also* Pl. Rep. Mem. Ex. E, at 3, ECF No. 30-5 ("[W]e do believe that it is in the national interest because of the threat that unsecured chemical weapons pose given the chaotic conditions on the ground in Syria.").

standing interests in obtaining these weapons and using them to attack the United States and its

allies and partners."[25]

> ### ii.   The memos apparently contain matching specificity in identifying legal precedents.

The 2018 memo repeatedly cites as precedent the 2011 military engagement in Libya and

accompanying OLC opinion[26] supporting the President's authority to use military force in

Libya—precedents that the government likewise cited in 2017.[27] The 2018 memo also discusses,

in the context of the national interest against use of chemical weapons, precedents in this regard,

including the Chemical Weapons Convention and UN Security Council Resolutions 2118, 2209,

2235, and 2319—the very precedents discussed in the 2017 Basis for Using Force talking

points.[28]

> ### iii.   The memos apparently contain matching discussions of whether the missile strikes on Syria rose to the level of a "war."

The 2018 memo concludes that the "limited" nature of the engagement "did not amount

to war" and "therefore did not require prior congressional approval."[29]  That's the same

conclusion reached in 2017, when an NSC spokesperson confirmed that the strikes were within

the President's power and did not need congressional approval.[30]  Likewise, in 2017, then-

---

[25] Pl. Cross-Mem. Ex. I, at 3.

[26] *Authority to Use Military Force in Libya*, 35 Op. OLC ___ (Apr. 1, 2011), https://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in-libya_0.pdf.

[27] *Compare* 2018 memo at 7, 8, 9, 10, 11, 12, 14, 18, 19, and 21 *with* Pl. Cross-Mem. Ex. I, at 3.

[28] 2018 memo, at 17; Pl. Cross-Mem. Ex. I, at 3 (also mentioning UNSCRs 1540 and 2314).

[29] 2018 memo, at 22.

[30] Pl. Cross-Mem. Ex. H, at 3.

Secretary Tillerson gave the same answer to a Senate Committee.[31]

In the discussion of whether the 2017 Syrian missile strikes rose to the level of war, not only did the 2018 memo opine on the 2017 strikes as "limited,"[32] but it elucidated the criteria used for judging what constitutes a "war", i.e., no ground troops, circumscribed mission to minimize risk of casualties, limited duration, low likelihood of escalation, and deconfliction steps.[33]  Immediately following the 2017 strikes, key Administration officials gave statements on those same criteria, with then-Secretary Tillerson and then-National Security Advisor McMaster describing the strikes "aimed at this particular airfield for a reason,"  "measures put in place to avoid … a hazard to civilians . . . ," and following "deconfliction agreements."[34] Defense Secretary Mattis echoed the same considerations days later.[35]

### iv.    The superficial differences highlighted by the government are immaterial.

In an attempt to show that Protect Democracy has not met its burden of production, the government harps on superficial differences between the 2018 and 2017 memos. None matter.

---

[31] Pl. Rep. Mem. Ex. B, at 13, ECF No. 30-2 (Senator Kaine quoting Secretary Tillerson's on-record answer during a Senate Foreign Relations Committee hearing.) ("The April 6 US military strike on Shayrat Airfield in Syria was . . . authorized . . . pursuant to [the President's] power under Article II of the Constitution, as Commander in Chief and Chief Executive, to use this sort of military force missile strikes overseas to defend important U.S. national interests.").

[32] 2018 memo, at 3.

[33] *Id.* at 20-22.

[34] Pl. Cross-Mem. Ex. D, at 6-8.

[35] Pl. Rep. Mem. Ex. D, at 2, ECF No. 30-4 ("We determined that a measured military response could best deter the regime from doing this again. As always, we examined how best to avoid civilian casualties . . . . We were aware of the presence of Russians at the airfield and took appropriate actions to ensure no Russians were injured in the attack.").

**Different lengths—meaningless.** The government observes that the 2018 memo is longer than the 2017 memo.[36] But that suggests only that the government *already* has disclosed much *more* than the information in the 2017 memo.  That's obviously not a reason to withhold the earlier, less comprehensive document.[37] Moreover, there's no classification differential between the two memos because Protect Democracy long ago abandoned its claim for disclosure of the few classified "words and phrases" found on a single page of the 2017 memo.[38]

**Different authors—hardly.** There's likewise no meaningful difference in the authors of the memos: OLC, the named author of the 2018 memo, also was the primary author of the 2017 memo.[39]

---

[36] Gov. Supp., at 6; Third Decl. of Paul P. Colborn ¶ 3, ECF No. 37-2.

[37] Even if there were non-overlapping information between the 2017 and 2018 memos which the 2018 memo did not disclose, such non-exempt information could be segregated. *See Bayala v. U.S. Dep't of Homeland Sec.*, 264 F. Supp. 3d 165, 174-77 (D.D.C. 2017).

[38] Pl. Cross-Mem.at 8-10.  While the 2017 factual background section includes "a limited number of discrete words and phrases" on that first page that are classified, Decl. of Patricia Gaviria ¶13, ECF No. 24-8, those words and phrases are not in the legal analysis portion of the memo and the government hasn't challenged Protect Democracy's suggestion that any such words and phrases could be easily redacted.

[39] The government's argument that OLC it is not the author of the 2017 memo betrays the facts in the *Vaughn* Index, an the very role of OLC. While OLC claims that "an interagency group of attorneys—including OLC attorneys" authored the 2017 memo, Third Decl. of Paul P. Colborn ¶ 2, the *Vaughn* Index and government affidavits show that it was only OLC that held the pen throughout the drafting process. *See Vaughn* Index, Nos. 1-3, ECF No. 24-7. If we inquire into exactly who are the other lawyers in the interagency process, and their role, we find that: 1) no other DOJ components—Office of the Attorney General, Office of the Deputy Attorney General, or National Security Division—indicate they even possessed a copy, draft or final; 2) the State Department had only a final copy; 3) the Department of Defense had only a draft, indicating that neither agency was part of the complete process, *see Vaughn* Index; and 4) the National Security Council's role was, at most, to "solicit and receive" it. *See* Suppl. Decl. of Eric F. Stein ¶ 6, ECF No. 28-1.  Finally, OLC's role as the primary author of the 2017 memo is unsurprising; OLC's "principal function," after all, is "to assist the Attorney General in his role as legal adviser to the President." *See* Decl. of Paul P. Colborn ¶ 2, ECF No. 24-3.

**Different strikes—irrelevant.** Nor does it matter that the memos were written about strikes that occurred at different times. The memos concern the same type of missile strikes against the same enemy in the same country; and they recite the same analysis of the same (three) national interests that purportedly supported the President's Article II power to issue "limited strikes" without congressional authorization. And both memos memorialized advice sought by Administration officials on the President's authority to conduct military action, after which the President took military action.[40] It doesn't matter that the government authored the formal 2018 memo after the airstrikes; the government provided the advice in that memo *before* the 2017 and 2018 strikes.

At bottom, the government's nit-picking of differences between the memos does nothing.

*    *    *

In sum: The Court got it exactly right when it identified the multiple areas of apparent duplication between the requested information in the 2017 memo and the information in the previously disclosed 2018 memo; and Protect Democracy accordingly has carried its burden of production under this Circuit's official-acknowledgment test.

### C.  The government hasn't rebutted Protect Democracy's prima facie showing.

Because Protect Democracy has satisfied its initial burden to "point to specific information in the public domain that appears to duplicate that being withheld," "it is up to the government . . . to rebut the plaintiff's proof by demonstrating that the specific . . . records identified have since been destroyed . . . or otherwise removed from the public domain."

---

[40] *See* Decl. of Paul P. Colborn ¶ 18 (attesting that the 2017 memo was "for the purpose of providing advice and recommendations to the President and/or other senior Executive Branch officials regarding the legal basis for potential military action."); *cf.* 2018 memo, at 1 ("Prior to the Syrian operation, you requested our advice on the President's authority. Before the strikes occurred, we advised that the President could lawfully direct them . . . .").

*Cottone*, 193 F.3d at 554-56. But the government makes no such showing here because it cannot; the memorandum was posted on the internet for all the world to see, presumably forever.

## II.   In the alternative, the Court should review the 2017 memo in camera to determine whether releasing the 2018 memo waived Exemption 5.

The government concedes that the Court has broad discretion to determine whether to conduct *in camera* review. *See* Gov. Supp. at 13 ("[A] court has broad discretion to determine the need for *in camera* review.") (parenthetically quoting *Ctr. for Auto Safety,* 731 F.2d at 20). And the Supreme Court "has long held the view that *in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege." *Kerr v. U.S. District Court for N.D. Cal.*, 426 U.S. 394, 405-06 (1976). In fact, *in camera* review is likely to be most helpful in cases like this one, in which a document's contents are in question. *See Carter v. U.S. Dep't of Commerce,* 830 F.2d 388, 393 (D.C. Cir. 1987). It is most favored when the burden on the court is not large because only a small number of documents are at issue. *See id.* (Here, the Court need only review a short memorandum.) It is also warranted where the government's declarations are conclusory,[41] and there is even "a greater call" for *in camera* review where there is a "strong public interest in disclosure" to redeem the purpose of FOIA of having "an informed, intelligent electorate." *Allen*, 636 F.2d at 1299. It's therefore unsurprising that courts in similar circumstances have granted *in camera* review.[42]

---

[41] *See, e.g., Allen v. CIA,* 636 F.2d 1287, 1298 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology of Wash., D.C., Inc. v. Smith,* 721 F.2d 828, 830 (D.C. Cir. 1983); *Carter*, 830 F.2d at 392 ("[I]f the affidavits submitted by the parties are conclusory—if the documents and justifications for withholding are not described in sufficient detail to demonstrate that the claimed exemption applies—*in camera* review may be necessary to allow meaningful de novo review."); *Envtl. Integrity Project v. Small Bus. Admin.*, 151 F. Supp. 3d 49, 53 (D.D.C. 2015) ("The government cannot satisfy this burden with affidavits that are vague or conclusory, or merely parrot the statutory standard.").

[42] *See, e.g., ACLU v. U.S. Dep't of Justice*, No. 15-cv-1954, 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016) (granting *in camera* review of policy directive after "a document purporting to

The government offers several arguments against *in camera* review, but none has merit.

1.     The government claims that it has obviated the need for *in camera* review by submitting an OLC declaration conclusorily asserting that "the content of the documents is . . . quite different."[43] In a table, the declaration appears to present a detailed analysis; but on closer examination, the table contains only one row addressing the memo's content—and that row, tellingly, provides dates and descriptions of two very similar military actions.[44]

2.     The government's contention that the 2018 memo adopts no part of the 2017 memo's reasoning[45] simply cannot be squared with the Court's verifiably accurate observation that the 2018 memorandum "explicitly draws on the administration's public-facing legal justifications for the 2017 strike."[46]

3.     The government asserts that the 2017 memo is "highly classified"[47]; but as previously mentioned, that's irrelevant.  The government has confirmed that only a few words are classified, and Protect Democracy has no objection to redacting those words.[48]

Thus, if the Court is not inclined to grant summary judgment for Protect Democracy

---

summarize at least part of its contents was released by the White House to the public," because it was "[t]he only way to determine whether the [g]overnment (1) ha[d] a viable claim of presidential communications privilege, and (2) to what extent if at all that privilege may have been waived . . . ."); *see also N.Y. Times Co.*, 756 F.3d at 121 (granting *in camera* review for OLC memoranda).

[43] Third Decl. of Paul P. Colborn ¶ 6.

[44] *Id.* ¶ 5.

[45] *Id.* ¶ 8.

[46] Order, at 3-4.

[47] Gov. Supp., at 13 n.6.

[48] Pl. Rep. Mem., at 23 n.27.

based on the evidence submitted, it still should exercise its discretion to conduct the modest

amount of *in camera* review "needed in order to make a responsible de novo determination on

the claims of exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).

## CONCLUSION

The strong public interest in disclosure weighs in favor of releasing the 2017 memo,

because "being closed off from . . . a debate" over the legality of the missile strikes "is itself a

harm in an open democracy." *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F.

Supp. 3d 293, 300 (D.D.C. 2017).

For the reasons stated above and in Protect Democracy's summary judgment briefs, the

government has waived any FOIA exemption that could have applied to the 2017 memo.

Accordingly, the Court should enter summary judgment for Protect Democracy. Failing that, the

Court should conduct the requested *in camera* review to determine the issue of waiver.

Respectfully submitted,

Date:  July 3, 2018                    */s/ Justin Florence*_____
                                       JUSTIN FLORENCE (DC Bar No. 988953)
                                            Justin.Florence@protectdemocracy.org
                                       ALLISON F. MURPHY (Bar No. 975494)
                                            Allison.Murphy@protectdemocracy.org
                                       CAMERON O. KISTLER (DC Bar No. 1008922)
                                            Cameron.Kistler@protectdemocracy.org
                                       The Protect Democracy Project, Inc.
                                       2020 Pennsylvania Ave., NW #163
                                       Washington, DC 20006

                                       STEVEN A. HIRSCH (DC Bar No. 418647)
                                            Steve.Hirsch@protectdemocracy.org
                                       Consultant, The Protect Democracy Project, Inc.
                                       2020 Pennsylvania Ave., NW #163
                                       Washington, DC 20006

BENJAMIN L. BERWICK (D.D.C. Bar No. MA0004)

Ben.Berwick@protectdemocracy.org

The Protect Democracy Project

10 Ware St.

Cambridge, MA 02138

Phone: 202-599-0466

Fax: 929-777-8428

*Counsel for Plaintiff*