**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE PROTECT DEMOCRACY PROJECT, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF DEFENSE**, *et al.*, <br><br> Defendants. | Case No. 17-cv-00842 (CRC) |

**MEMORANDUM OPINION**

On April 6, 2017, President Trump ordered a cruise missile strike on the Shayrat military airfield in western Syria. Administration officials explained that the strike was a response to the chemical attack that had killed dozens of Syrian civilians three days earlier—one that, according to U.S. intelligence, had been directed by Syrian president Bashar Al-Assad.

The day after the U.S. missile strike, a nonprofit called The Protect Democracy Project, Inc. submitted several requests under the Freedom of Information Act ("FOIA") seeking documents related to the President's legal authority to launch the strike. It filed these requests with the Department of State, the Department of Defense, and three components of the Department of Justice, including the Office of Legal Counsel. The agencies released some responsive documents but withheld fifteen documents in full. The withheld documents fall into three categories. The first includes three iterations of a legal memorandum produced by an interagency group of lawyers for the President's national security staff on the day the strike was ordered. The second is an outline drafted by attorneys in the Department of Justice's Office of Legal Counsel to help the Office advise the Attorney General on the legal basis for the strike the day after it was launched. And the third includes several sets of talking points prepared to assist

Executive Branch officials in answering questions from the press and from Congress. To justify withholding these documents, the agencies invoked several FOIA exemptions. Chief among them was Exemption 5, which shields from disclosure documents that would typically be privileged in civil discovery. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).

Protect Democracy and the government now ask the Court to decide whether the documents were properly withheld under FOIA. For the most part, the Court finds the agencies' withholdings justified. The Court does, however, find that a small amount of information in several of the talking-point documents has already been officially acknowledged, and thus that the agencies may not withhold that information. It will therefore grant in part and deny in part each party's motion for summary judgment.

I. **Background**

On April 7, 2017, the day after the Shayrat airfield strike, Protect Democracy sent identical FOIA requests to the Department of State ("State"), the Department of Defense ("DOD"), and three components of the Department of Justice ("DOJ")—collectively, "the agencies." The requests sought:

> Any and all records [from April 4, 2017 through the present], including but not limited to emails and memoranda, reflecting, discussing, or otherwise relating to the April 6, 2017 military strike on Syria and/or the President's legal authority to launch such a strike. This request includes, but is not limited to, internal [agency] communications, communications between [agency] employees and the Executive Office of the President, and communications between [agency] employees and other agencies.

Compl. Exs. A, C, E, G, I.

Having received no responses to these requests a month after their submission, Protect Democracy brought this lawsuit alleging violations of FOIA. It also moved for a preliminary injunction that would compel the agencies to review its requests on an expedited basis. Mot. Prelim. Inj. at 2. In July 2017, this Court granted that request. See Order, ECF No. 15 (July 17,

2

2017). The parties worked to narrow the scope of Protect Democracy's requests and the agencies provided a final response in September 2017. Joint Status Report, ECF No. 20, ¶¶ 2–3 (Sept. 15, 2017). The agencies released some documents in full, released redacted versions of others, and withheld fifteen outright. In redacting and withholding certain documents, the agencies invoked several of FOIA's exemptions—specifically, Exemptions 1, 5, 6, and 7. The parties then filed cross-motions for summary judgment on the question of whether the agencies properly withheld the fifteen documents. At this point, the crux of their dispute is whether the documents are protected under Exemption 5, which shields materials "normally privileged in the civil discovery context." Sears, 421 U.S. at 149.

After an initial review of the parties' filings, the Court concluded that it needed to see the talking points—documents 5 through 15 in the government's Vaughn index[1]—before it could resolve an important aspect of the dispute. See 5 U.S.C. § 552(a)(4)(B) (authorizing the Court to "examine the contents of [withheld] agency records in camera to determine whether such records or any part thereof shall be withheld" under a FOIA exemption). Specifically, Protect Democracy contends that the government has waived any privileges applicable to the withheld documents by publicly acknowledging information contained in them. See Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990) ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."). With respect to documents 5 through 15, the Court found that Protect Democracy had cited public statements by Trump Administration officials sufficient to meet its "initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." Order,

---

[1] A "Vaughn index" is a document that summarizes the government's withholdings of documents responsive to a FOIA request. See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

ECF. No. 33, at 3 (Apr. 25, 2018) (quoting Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983)). Yet the government's descriptions of the documents were not detailed enough for the Court "to decide whether their information sufficiently overlaps with the public statements so as to satisfy the D.C. Circuit's exacting test for public acknowledgment." Id. The Court has now reviewed documents 5 through 15 *in camera*.

The Court also directed supplemental briefing on another issue related to public acknowledgement. On May 31, 2018, the Office of Legal Counsel ("OLC") publicly released a 22-page memorandum justifying the legality of a second set of missile strikes that President Trump directed against Syria on April 13, 2018. See Steven A. Engel, Ass't Att'y Gen., OLC, April 2018 Airstrikes Against Syrian Chemical-Weapons Facilities (May 31, 2018), https://perma.cc/NX69-56E6. Noting that little of the 2018 memorandum's analysis was "particularized to the recent strike" and that some of its reasoning "closely align[ed] with the publicly stated rationale for the 2017 strike," the Court found it "at least plausible that 'specific information in the public domain' (*i.e.*, the 2018 memorandum) duplicated 'that being withheld' (*i.e.*, the 2017 memorandum)." Order, ECF No. 36, at 3–4 (June 5, 2018) (quoting Afshar, 702 F.2d at 1130). The Court therefore ordered the parties to file supplemental briefs, with affidavits as necessary, addressing whether OLC's release of the 2018 memorandum constituted a waiver of any applicable privileges for purposes of Exemption 5. The parties submitted those briefs in late June. The government's included a sworn declaration from Paul Colborn, a senior OLC official responsible for overseeing the Office's FOIA requests.

## II. Legal Standards

FOIA requires federal executive agencies to produce their records upon request unless one of the Act's nine exemptions applies. See 5 U.S.C. § 552(b). The exemptions aim "to

4

balance the public's interest in governmental transparency against 'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'" United Techs. Corp. v. DOD, 601 F.3d 557, 559 (D.C. Cir. 2010) (alteration in original) (quoting Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc)).  "But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976).  Thus, where a plaintiff challenges an agency's withholding of records, the agency bears the burden of showing that one of FOIA's exemptions applies. ACLU v. DOD, 628 F.3d 612, 619 (D.C. Cir. 2011).

FOIA disputes are generally resolved on cross-motions for summary judgment.  In evaluating each motion, the Court must view the record in the light most favorable to the non-movant.  The agency may satisfy its burden of showing that a FOIA exemption applies through an affidavit that "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." ACLU v. DOD, 628 F.3d at 619.

**III.  Analysis**

The agencies withheld fifteen documents that they deemed responsive to Protect Democracy's requests.  The Court will evaluate the agencies' claims of privilege over each category of documents in turn: the legal opinion, the OLC outline, and the talking points.

   A.  Interagency Legal Memorandum

The agencies' Vaughn index identifies three versions of a seven-page legal memorandum prepared on April 6, 2017 by a group of attorneys from State, DOD, and OLC.  The first two

5

documents are final versions of the memorandum—one belongs to State and the other to DOJ. The third is a "prior draft" version from DOD. The government contends that all three documents are exempt from disclosure under FOIA Exemption 5.[2] The Court agrees.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Put more simply, the exemption shields information that would be "normally privileged in the civil discovery context." Sears, 421 U.S. at 149. "*Normally* privileged" means that, unlike in civil discovery, courts do not ask whether the agency's assertion of privilege is overcome by the plaintiff's showing of need. Rather, "[t]he test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." FTC v. Grolier Inc., 462 U.S. 19, 26 (1983). If not, then withholding is proper.

The government contends that the legal memorandum is covered by three well-established privileges—those that protect presidential communications, attorney-client communications, and deliberative processes. Each of these privileges has been recognized as a basis for withholding documents under Exemption 5. See Judicial Watch, Inc. v. DOJ, 365 F.3d 1108, 1113 (D.C. Cir. 2004); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980).

---

[2] The agencies initially also invoked Exemptions 1 and 3 in withholding the memorandum, claiming that it contained classified and statutorily protected information. But Protect Democracy has clarified that it seeks only portions of the document that provides legal analysis regarding the military strikes, and not any of its factual information. The Government concedes that this legal analysis is not protected under Exemptions 1 or 3, and that the information Protect Democracy seeks is segregable from the protected factual material in the memorandum. Thus, the sole remaining issue with the memorandum is whether information in the documents was properly withheld under Exemption 5.

Before explaining its conclusion that the memorandum falls within at least one of these privileges, the Court must confront the threshold issue of whether any of its information has been "officially acknowledged" such that the information must be disclosed over the agencies' otherwise valid Exemption 5 claim, or if any applicable privileges have been otherwise waived. For information to be "officially acknowledged," "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." ACLU v. DOD, 628 F.3d at 620–21. The related doctrine of waiver is more context-specific, but at a minimum it bars agencies from withholding documents under Exemption 5 that have been shared outside of the government. See Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Rep., 237 F. Supp. 2d 17, 25 (D.D.C. 2002) ("[C]ommunications between agencies and outside parties are not protected under Exemption 5.").[3]

---

[3] The official acknowledgement doctrine developed in cases involving different FOIA exemptions—namely, Exemptions 1 and 3, which relate to classified or otherwise sensitive information. See ACLU v. DOD, 628 F.3d at 622. The Court is not aware of any cases in this Circuit applying the doctrine to overcome withholdings made under Exemption 5; rather, the courts that have evaluated the relationship between public disclosure and Exemption 5 have done so using the doctrine of *waiver*. See, e.g., Citizens for Responsibility & Ethics in Wash. v. DOJ, 658 F. Supp. 2d 217, 236–37 (D.D.C. 2009). But, at least in this case, the Court finds the analysis basically duplicative. Surely if the government publicly releases information that specifically matches information it has withheld pursuant to a privilege under Exemption 5, that release amounts to a waiver of privilege. See, e.g., N.Y. Times v. DOJ, 756 F.3d 100, 114 (2d Cir. 2014) ("Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption, and the attorney-client and deliberative privileges, in the context of Exemption 5, may be lost by disclosure." (citations omitted)). And Protect Democracy's assertion of waiver mostly overlaps with its argument regarding official acknowledgment: it claims "that the government's public statements in the wake of the strike . . . waived privilege as to at least some of the material in either the memo and/or the talking points." Pl.'s Mot. Summ. J. at 29.

7

Protect Democracy argues two bases for official acknowledgement or waiver: first, public statements from government officials to the press after the strikes and, second, the OLC opinion released last May about the 2018 strikes. In the Court's view, neither amounts to official acknowledgement.

The press statements are discussed in more detail below in the context of whether they officially acknowledged the content of press guidance documents prepared after the strike. It is enough to say here that they did not plausibly match the analysis in the legal memorandum closely enough to constitute official acknowledgement. None of the cited public statements mentioned the existence of a legal memorandum regarding the strikes, nor did any officials publicly state a legal rationale particularized enough that one could expect it to duplicate the analysis of a seven-page interagency memorandum. This case is therefore unlike the decision that Protect Democracy primarily relies on, where the Second Circuit found that the release of a "white paper" summarizing an OLC opinion and officials' public statements acknowledging reliance on the OLC opinion together amounted to a waiver of any applicable privileges over the opinion. See N.Y. Times v. DOJ, 756 F.3d 100, 114–16 (2d Cir. 2014).

Nor does the recently released 2018 OLC opinion officially acknowledge the contents of the 2017 memorandum. In his declaration supporting the government's supplemental brief, OLC official Paul Colborn states plainly that "[n]othing in the [2018] Opinion quotes from, describes, discloses, or even refers to the [2017 Opinion]. Indeed, no part of the [2018] Opinion makes any reference at all to any legal advice that OLC or any other government attorney did or did not provide to the President or his senior advisers prior to the 2017 military strike against the Al Shayrat airfield." Third Decl. of Paul P. Colborn Supp. Defs.' Mot. Summ. J. ¶ 9. The Court must accept this statement as true absent contrary evidence or signs that the agency is acting in

bad faith—neither of which are present here.  SafeCard Servs. Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991); see also ACLU v. DOD, 628 F.3d at 621 (giving "substantial weight" to agency affidavit's statement "that there are substantive differences between the content of the publically released government documents and the withheld information").  And contrary to Protect Democracy's argument, *in camera* review of the 2017 memorandum is not warranted, as Mr. Colburn's declaration provides sufficiently detailed information for the Court "to make a responsive de novo determination" regarding the question of official acknowledgment.  Ray v. Turner, 587 F.2d 1187, 1195 (D.C. Cir. 1978); see also ACLU v. CIA, 109 F. Supp. 3d 220, 243 (D.D.C. 2015) (declining to engage in *in camera* review where government declaration provided "detailed descriptions of [withheld] legal memoranda").  In short, Protect Democracy has not shown that "the information requested" in the 2017 memorandum "match[es] the information previously disclosed" in the 2018 memorandum.  ACLU v. DOD, 628 F.3d at 620.

That leaves whether the legal memorandum is privileged, such that the agencies properly withheld it under Exemption 5.  The Court finds that the withholding of the memorandum is justified under the presidential communications privilege, and it therefore need not decide whether the attorney-client or deliberative-process privileges would also support withholding.

The presidential communications privilege protects "documents or other materials that reflect presidential decision-making and deliberations and that the President believes should remain confidential."  Sealed Case, 121 F.3d 729, 746 (D.C. Cir. 1997).  When properly invoked, the privilege broadly protects "documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."  Id. at 745.  But as its name suggests, this privilege is narrow with respect to *whose* documents it protects.  Materials are covered only if they were "authored or solicited and received by those members of an immediate White House adviser's

9

staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." Id. at 752. If they meet that definition, the communications need not actually be relayed to the President himself, nor even to an immediate White House adviser, because "in many instances advisers must rely on their staff to investigate an issue and formulate the advice to be given to the President." Id.

The legal memorandum here was not authored or solicited by the President himself. Rather, the government's asserted basis for the privilege is that the advice in the document was solicited by the Deputy Legal Adviser of the National Security Council ("NSC").[4] According to the government, the Deputy's role in the President's national security decisionmaking, plus the fact that the opinion was solicited for the purpose of advising him on whether to launch the strike, means that the opinion is necessarily covered by the privilege.

The Court agrees. At the outset, the structure of the NSC shows that its Legal Adviser is the sort of "immediate White House adviser" whose national security documents are subject to protection by the privilege. The NSC sits within the Executive Office of the President and, among its other goals, works to "assess and appraise the objectives, commitments, and risks of the United States in relation to the actual and potential military power of the United States, and make recommendations thereon to the President." 50 U.S.C. § 3021(b)(2). The Council consists of the President and Vice President, several cabinet members, and "a civilian executive secretary

---

[4] In its summary judgment motion and accompanying declarations, the government revealed only that "staff" to the NSC Legal Adviser solicited the opinion. In response to Protect Democracy's argument that these assertions were not sufficiently specific, the government submitted a supplemental declaration explaining that the Deputy NSC Legal Adviser solicited and received the opinion, and that he also "coordinated with the interagency group of attorneys to create the document." Suppl. Decl. of Eric F. Stein Supp. Defs.' Mot. Summ. J ¶ 7.

appointed by the President" who, in turn, may appoint a staff. Id. § 3021(c)(1), (e)(1)–(2). That staff includes a Legal Adviser who, in the current administration, carries the full title of "Deputy Assistant to the President, NSC Legal Advisor, and Deputy Counsel to the President for National Security Affairs." Press Release, President Donald J. Trump Announces Key Additions to the Office of the White House Counsel (Mar. 7, 2017), https://perma.cc/W6Y9-EZB2. He attends all meetings of the so-called "Deputies Committee," which is "the senior sub-Cabinet interagency forum for consideration of, and where appropriate, decision making on policy issues that affect the national security interests of the United States." Organization of the National Security Council, Homeland Security Council, and Subcommittees, 82 F.R. 16881, 16883 (Apr. 4, 2017). In short, the Legal Adviser has "broad and significant responsibility for investigating and formulating the advice to be given the President" regarding national security. Sealed Case, 121 F.3d at 752. So if the Legal Adviser were to solicit a document related to a national security decision being contemplated by the President, it would no doubt be protected by the presidential communications privilege.

It follows that opinions solicited by the *Deputy* NSC Legal Adviser are no less protected. Again, the D.C. Circuit has expressly held that documents solicited by the staff of immediate White House advisers may be covered by the privilege. Sealed Case, 121 F.3d at 752 (shielding documents authored by a legal extern "at the request of the two associate White House Counsel with broad and significant responsibility" for a White House investigation). And based on the government's declarations, it is clear that the Deputy NSC Legal Adviser is the sort of staff member that the D.C. Circuit had in mind when setting the scope of the privilege. As the government explains, the Deputy "has broad and significant responsibility for investigating and formulating advice to the President in matters that implicate the President's decisions concerning

foreign policy or national security." Suppl. Decl. of Eric F. Stein Supp. Defs.' Mot. Summ. J. ("Suppl. Stein Decl.") ¶ 6. He is no line attorney. His full title is "Deputy Legal Advisor, Special Assistant to the President, and Senior Associate Counsel to the President." He is the sole individual with that title. And unlike the officials whose documents the D.C. Circuit declined to protect in Judicial Watch, the Deputy has no official role outside the walls of the White House. Cf. 365 F.3d at 1117 (declining to extend privilege to documents solicited by DOJ officials).

Protect Democracy objects that "the government's declarations are largely silent as to the role that both the [Deputy NSC Legal Adviser] and the supposed legal advice played" in the President's decision of whether to launch the strikes. Pl.'s Reply at 8. It claims that, without more specific information on that front, the Court cannot be sure that the opinion was actually solicited to aid presidential decisionmaking.

To be sure, the government's declarations provide little detail on the role of the legal opinion in the President's decision. A declaration from a State Department official simply states that the Deputy Legal Adviser solicited the opinion "for the purpose of providing advice and recommendations to the President and other senior Executive Branch officials regarding the legal basis for potential military action." Suppl. Stein Decl. ¶ 6. There is no indication that the President was briefed on the legal basis for the strike. But the government need not make a particularized showing about the role of a certain document in the President's decision. Rather, the very nature of the decision here—whether to attack a foreign nation—assures the Court "that even if the President were not a party to the communications over which the government is asserting presidential privilege, these communications nonetheless are intimately connected to his presidential decisionmaking." Sealed Case, 121 F.3d at 753. That is because commanding the armed forces, like appointing and removing the officers at issue in Sealed Case, is "a

quintessential and nondelegable Presidential power." Id. at 752; see U.S. Const. art. II, § 2, cl. 1.[5] Thus, even if the legal analysis in the memorandum was not communicated to the President, the circumstances of its solicitation—by the staff of a close national security adviser leading up to an important military decision—shows that the document was created for the purpose of advising the President on that decision. It is protected by the presidential communications privilege and is therefore exempt from disclosure under FOIA Exemption 5.

B. OLC Outline

The agencies have also withheld an "an unclassified outline, prepared by OLC attorneys for the purpose of advising the Attorney General regarding the legal basis" for the April 6 missile strike. Decl. of Paul P. Colborn Supp. Defs.' Mot. Summ. J. ("First Colborn Decl.") ¶ 19. The outline is not dated, but OLC believes that it was finalized on April 7, the day after the strike. See Defs.' Mot. Summ. J. Ex. 6 ("Vaughn Index") at 3. The Assistant Attorney General in charge of OLC used the outline "to assist him in providing oral legal advice to the Attorney General" regarding the legal basis for the strike. Id.

The government claims that the outline is exempt from disclosure under Exemption 5 because it is covered by deliberative process privilege and by attorney-client privilege. The Court agrees with respect to the latter privilege, and thus need not decide whether the former also applies.

---

[5] Of course, Protect Democracy doubts that the President has lawfully exercised this power—it seeks the interagency memorandum in part because it wants to expose the President's lack of constitutional authority to launch the strikes. But an allegation that the executive's decision was unlawful cannot render unprotected legal opinions he seeks in making that decision; legal opinions are most valuable in the face of legal indeterminacy. Rather, the relevant point for purposes of the privilege is that the President's decision here—whether lawful or not—could not be delegated to another executive branch official, and thus the opinion by definition spoke to "governmental operations that . . . call ultimately for direct decisionmaking by the President." Sealed Case, 121 F.3d at 752.

13

An agency relying on attorney-client privilege to withhold a document under FOIA must show two things. First, that the document contains information communicated between an attorney and her client regarding "a legal matter for which the client has sought professional advice." Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 252 (D.C. Cir. 1977). Protect Democracy concedes that the outline meets this requirement. Pl.'s Cross-Mot. Summ. J. at 16; see First Colborn Decl. ¶ 25. Second, that the communication "is based on confidential information provided by the client"—*i.e.*, information that the client expected to remain confidential and that was not actually shared with a third party. Mead Data, 566 F.2d at 254. Protect Democracy challenges application of the privilege on this second ground. It specifically contends that the government has offered "nothing more than conclusory assertions" that confidentiality was maintained. Pl.'s Cross-Mot. Summ. J. at 16. The Court disagrees.

Mr. Colborn explains in his declaration that information in the outline—being based on legal advice provided in the interagency legal memorandum discussed above—"was intended to be confidential and to [his] knowledge has maintained its confidentiality." First Colborn Decl. ¶ 25. The context of the document's creation helps explain his expectation of confidentiality: "the outline was prepared by lawyers within OLC in preparation for providing legal advice to the Attorney General in connection with his role as chief legal adviser to the President." Id. More specifically, the outline (at least in part) summarized legal advice that an interagency group of lawyers had given the President's national security team the previous day—advice based on factual material provided to the lawyers by the President and his national security team—leading up to the strike. Id. ¶¶ 22, 25; see Second Decl. of Paul Colborn Supp. Defs.' Mot. Summ. J. ¶ 3.

Protect Democracy is correct that, when invoking attorney-client privilege, the government cannot rely only on conclusory assertions that confidentiality was expected and

14

maintained. See Mead Data, 566 F.2d at 255; Senate of the Com. of P.R. ex rel. Judiciary Comm. v. DOJ, 823 F.2d 574, (D.C. Cir. 1987) ("[W]here no factual support is provided for an essential element of the claimed privilege or shield, the label 'conclusory' is surely apt."). But courts routinely endorse invocations of attorney-client privilege based on government declarations similar to Mr. Colborn's—and, indeed, based on those of Colborn himself. See, e.g., N.Y. Times Co. v. DOJ, 282 F. Supp. 3d 234, 238–39 (D.D.C. 2017); Judicial Watch, 245 F. Supp. 3d at 33–34. The case might be different if there were a basis in the record from which to infer that the contents of the outline were shared beyond the Attorney General, OLC, and the President and his national security staff (as the ultimate "client" for which the advice was intended). See, e.g., Mead Data, 566 F.2d at 255 (observing that "cryptic description" of withheld document "show[ed] that at least part of its information base was not confidential"). But there is no evidence that the specific legal advice provided in the memorandum and summarized in the outline was disclosed beyond that group. And, if anything, the sensitive nature of the legal advice demands the opposite inference. N.Y. Times, 282 F. Supp. 3d at 240 ("Given its classified status, it seems unlikely the [withheld] Memo has been widely or indiscriminately circulated.").

At bottom, based on the government's description of the document and its declarations, the Court finds that the outline is the sort of document that would routinely be protected by attorney-client privilege in civil discovery. Its disclosure would undermine the purpose of the privilege: "to assure that a client's confidences to his or her attorney will be protected, and therefore encourage clients to be as open and honest as possible with attorneys." Coastal

15

States, 617 F.2d at 862. The agencies were permitted to withhold the outline pursuant to Exemption 5.[6]

    C. <u>Talking Points</u>

The final category of withheld materials consists of several sets of talking points designed to assist Executive Branch officials in responding to inquiries from the press and from Congress. The documents have some differences—particularly in their format—but share a similar character. Those numbered 5, 6, 7, 9, 10, 12, and 13 in the <u>Vaughn</u> index are versions of a "press guidance" document containing "proposed guidance and a hypothetical question and proposed response." Document 8 is described as a "Public Affairs Guidance" containing similar advice for high-level officials. Documents 14 and 15 consist of proposed answers to expected questions from Congress.

The government asserts that each of these documents is protected by the deliberative process privilege and therefore properly withheld under Exemption 5. Deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" <u>Dep't of Interior v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8 (2001) (quoting <u>Sears</u>, 421 U.S. at 150). To establish that a document is covered by the privilege, the government must show that it is both "predecisional" and "deliberative." <u>Coastal States</u>, 617 F.2d at 866. A predecisional communication is one that "occurred before any final agency decision on the relevant matter." <u>Nat'l Sec. Archive v. CIA</u>, 752 F.3d 460, 463 (D.C. Cir. 2014). A deliberative

---

[6] Protect Democracy raises the same argument regarding official acknowledgement for the OLC outline as it did for the interagency legal memorandum. For the same reason that the Court rejected its official-acknowledgement argument for the memorandum, it also does so for the outline. None of the public statements that Protect Democracy cites mention the outline, nor do they plausibly match its substance.

communication is one that "reflects the give-and-take of the consultative process." Coastal States, 617 F.2d at 866.

Protect Democracy's main argument is that, because the guidance documents were created after the missile strike, they cannot have been predecisional or deliberative. This argument has an intuitive ring, as "communications made after [a] decision and designed to explain it" are generally not covered by the deliberative process privilege. Sears, 421 U.S. at 152. But courts have generally found that documents created in anticipation of press inquiries are protected even if crafted after the underlying event about which the press might inquire. Competitive Enter. Inst. v. EPA, 232 F. Supp. 3d 172, 187–88 (D.D.C. 2017); Freedom Watch, Inc. v. NSA, 49 F. Supp. 3d 1, 8 (D.D.C. 2014); Judicial Watch, Inc. v. Dep't of Comm., 337 F. Supp. 2d 146, 174 (D.D.C. 2004). The idea is that these sorts of documents reflect deliberation about the decision of how to respond to the press—or, as relevant in this case, to members of Congress.

That is true of the talking-point documents here. Having reviewed all of them *in camera*, the Court concludes that they qualify as predecisional and deliberative. Revealing their contents would expose the process by which agency officials crafted a strategy for responding to the press and to Congress. Even if many of the documents summarize and collate facts rather than propose conclusions, "[t]he decision to include or exclude certain factual information in or from analytical documents is itself an important part of the deliberative process." Decl. of Daniel R. Castellano Supp. Defs.' Mot. Summ. J. ¶ 38; see Mead Data, 566 F.2d at 256 ("In some circumstances, . . . the disclosure of even purely factual material may so expose the deliberative process within an agency that it must be deemed exempted by [Exemption 5].").

As it did with the other categories of documents, however, Protect Democracy contends that even if these documents are privileged, the government has officially acknowledged or waived privilege over their contents through public statements. See Coastal States, 617 F.2d at 866 ("[E]ven if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). The Court upon reviewing the parties' motions for summary judgment found this argument plausible with respect to the talking-point documents and has now reviewed all of those documents *in camera*. Based on that review, it finds that most of their content has not been officially acknowledged, nor has the deliberative process privilege been otherwise waived.

With one exception. At least one government official has, in an on-the-record statement, replicated a paragraph that appears in several of the guidance documents.[7] Even though the agencies' formulation of this explanatory paragraph would otherwise be protected by deliberative process privilege and thus covered by Exemption 5, the government's official acknowledgement renders the exemption inapplicable. See Fitzgibbon, 911 F.2d at 765 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."); Sealed Case, 121 F.3d at 741 ("[R]elease of a document only waives . . . privileges for . . . information specifically released, and not for related materials."). The government must release the portions of the talking-point documents

---

[7] The Court cannot get more specific at this juncture; identifying the relevant material in this opinion would effectively deprive the government of a chance to appeal this ruling. If the government is not able to identify which portion of the guidance documents must be disclosed, the Court can do so *ex parte*.

18

that contain this paragraph, as they are reasonably segregable from the remainder of each document.[8]

## IV. Conclusion

The Court concludes that the legal memorandum (documents 1 through 3 in the Vaughn index) was properly withheld under FOIA Exemption 5 because it would routinely be covered by the presidential communications privilege. The OLC outline (document 4) was properly withheld under that exemption because it is protected by attorney-client privilege. As for the press guidance documents (documents 5 through 15), the Court finds that the documents were properly withheld as a general matter, but that certain of their contents have been disclosed to the public and thus must be released to Protect Democracy.

The Court will therefore grant in part and deny in part both parties' cross-motions for summary judgment. A separate order accompanies this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 21, 2018

---

[8] Protect Democracy contends that more information was officially acknowledged through the publication of a document called "Basis for Using Force" on a national security blog. See Marty Lederman, (Apparent) Administration Justifications for Legality of Strikes Against Syria, Take Care (Apr. 8, 2017) (reproduced in Pl.'s Mot. Summ. J. Ex. I). There is no evidence, however, that this document was "made public through an *official and documented disclosure*," as would be required for it to force disclosure of any duplicative information withheld under Exemption 5. ACLU v. DOD, 628 F.3d at 621 (emphasis added). Rather, all signs point to its publication being the result of "an anonymous leak," which "is presumptively an unofficial and unsanctioned act." Judicial Watch, Inc. v. DOJ, 898 F. Supp. 2d 93, 108 (D.D.C. 2012); see Lederman, supra ("The following document has begun to circulate outside the government. . . . I have not confirmed, however, whether it is a final, approved draft, who its authors are, and/or whether it will receive a more formal distribution.").

19